Filed 2/18/15  P. v. Villalobos CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>RICARDO VILLALOBOS, JR.,<br><br>    Defendant and Appellant. | F066057<br><br>(Super. Ct. No. F11906060)<br><br>**OPINION** |

-ooOoo-

## THE COURT[*]

APPEAL from a judgment of the Superior Court of Fresno County.  Hilary A. Chittick, Judge.

Robert Navarro, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the State Attorney General, Sacramento, California, for Plaintiff and Respondent.

-ooOoo-

---

[*] Before Cornell, Acting P.J., Gomes, J. and Peña, J.

A jury convicted appellant, Ricardo Villalobos, Jr., of second degree robbery (Pen. Code, § 211).[1]  In a separate proceeding, the court found true a serious felony enhancement (§ 667, subd. (a)), three prior prison term enhancements (§ 667.5, subd. (b)) and allegations that Villalobos had a prior conviction within the meaning of the three strikes law (§ 667, subds. (b)-(e)).  Following independent review of the record pursuant to *People v. Wende* (1979) 25 Cal.3d 436 and consideration of numerous issues raised by Villalobos, we affirm.

## FACTUAL AND PROCEDURAL HISTORY

On October 17, 2011, Carlos Duarte, his wife Kathy and their two children lived in one of two second floor apartments that were part of a four-plex located on San Pablo Avenue in Fresno.  Manuel Guevara and his wife and two children lived in the other second floor apartment.  The front door to Guevara's apartment was located in front of Duarte's front door on the opposite side of a small, illuminated hallway.  At about 9:20 p.m. that night, a man knocked on the door to Duarte's apartment and Duarte's wife answered the door as Duarte stood approximately five feet away.  The man was sweating profusely and appeared to be intoxicated.  He asked Duarte's wife if she had any money. Duarte's wife replied that she did not and closed the door.  A minute or two later there was another knock on the door.  Duarte's wife again answered the door and upon seeing the man at the door again, she said, "I told you I [don't] have any money."  The man then asked who lived across the way in the other apartment.  Duarte's wife told him that some Mexican immigrants did and closed the door.[2]

---

[1] Unless otherwise indicated, all further statutory references are to the Penal Code.

[2] At the trial Duarte testified the man appeared to be Mexican, was five feet nine inches to five feet ten inches tall, weighed about 180 pounds, and was in his late twenties or early thirties.  He also had long, black hair that he wore in a ponytail, a thin mustache and a tattoo of a paw print on the right side of his face and a stud on his right cheek.  The man was wearing a white T-shirt and pants.

2.

About a minute after closing the door, Duarte and his wife heard pounding four or five times on the door of the apartment across the way and he told his wife to call 911. Duarte then heard a male voice yelling in Spanish but he could not make out what he was saying.

Meanwhile, in the apartment across the way Guevara was preparing to go to work when he heard knocking and a man saying in Spanish to open the door. Guevara initially ignored the knocking but then it started again, stronger and louder. The man at the door then began kicking it and saying loudly in Spanish to open the door, that it was the police and immigration. Guevara walked toward the door and found that the door, which had been locked, was open six inches and that the left side of the man's body was already inside the apartment. Guevara put his foot in front of the door to prevent the man from coming inside.

As Guevara stood facing the man, the man pushed on the door and told Guevara loudly three or four times to give him all his money. Guevara told the man that he did not have any. Nevertheless, because he was afraid the man might come in the apartment and scare his children, he offered the man $20. The man had one hand in one of his front pants pockets along with something long that had a handle and looked like a knife. The man pointed to his waist and stated two or three times that he "was carrying" and would hurt Guevara if he did not give the man all the money. Out of concern for the safety of his children, Guevara gave the man the remainder of the $82 he had in his wallet and the man left.

After comforting his children, Guevara went outside his apartment and encountered police officers who had arrived on the scene. Guevara spoke only Spanish and was interviewed by Officer Kham Xiong with the assistance of Officer Arthur De Leon who translated for Xiong.

On October 17, 2011, Miguel Dominguez lived in one of the two first floor apartments of the four-plex where Duarte and Guevara lived. Around 9:20 p.m. that

3.

night, he began walking home from a friend's party at a residence located down the street from his apartment complex, on the opposite side of the street. As he stood on the sidewalk across the street from his apartment complex he saw a man reaching for something in his pants below his knee. The man raised his hands and said "puto" to Dominguez before walking into the apartment complex through a door and up some stairs that went to the second floor. Dominguez walked across the street and then back towards his friend's residence. However, he soon changed his mind and walked to his apartment complex. Dominguez was standing in front of the other apartment located on the ground level of the complex, when he heard banging. As Dominguez walked in front of the apartment complex en route to his apartment, he saw the man he had seen earlier come down the stairs from the apartments on the second floor. He also heard the man say that he "got it already" before the man directed himself to Dominguez and stated, "Dog, you better leave." The man had something in his hand but Dominguez could not tell what it was. Dominguez saw the man run down the street and into another apartment complex.

Sandra Sherman is Villalobos's aunt. On October 17, 2011, she lived with her son and daughter in an apartment on San Pablo Avenue. At approximately 10:00 p.m. that night Villalobos knocked on the door of Sherman's apartment and was let in by one of her children. Villalobos was nervous and excited and was holding a few dollars in one hand and some beer. Villalobos told Sherman he had just kicked in someone's door down the street and robbed them. Sherman then asked Villalobos to leave because she did not want any trouble at her house; Villalobos left within 10 minutes.

The following night between 6:30 p.m. and 7:00 p.m. Villalobos again showed up at Sherman's apartment while Sherman's daughter, son, and son's friend were home and Sherman was at a friend's house. After Sherman's daughter and her son's friend went to tell her that Villalobos was at her apartment, Sherman called the apartment and told Villalobos that she wanted him to leave or she would call the police. Villalobos would not leave so Sherman walked back towards her apartment and, en route, called the police

from a pay phone. During the call she told the dispatcher that Villalobos was the person who had been involved in the home invasion the night before.

When Sherman got to her apartment Villalobos was still there, nervous and pacing up and down. Sherman told Villalobos she was going to call the police but it did not seem to matter to him at the time. Eventually Fresno Police Officer David Wilkin arrived at Sherman's apartment. Officer Wilkin detained Villalobos and handcuffed him outside the apartment before he placed him in his patrol car. Officer Wilkin arrested Villalobos after interviewing Sherman.

At about 8:00 p.m. while walking by the apartment complex that he had seen a man run into the night before, Dominguez saw the police arresting the man that he had seen at his apartment complex the previous night.

On October 18, 2011, Guevara identified Villalobos from a photo lineup as the man who robbed him and he repeated his identification in court during the jury trial in this matter. Duarte was not able to identify anyone from a photo lineup as the man who knocked twice on his door on October 17, 2011. However, during the jury trial in this matter he was able to identify Villalobos in court as that man who knocked on his door.

On January 11, 2012,[3] defense counsel filed a *Pitchess*[4] motion seeking discovery of records for Officer David Wilkin which recorded or reflected any instance of conduct involving (1) excessive force, (2) fabrication of charges, (3) fabrication of evidence, (4) dishonesty, or (5) other instances of conduct unbecoming an officer.

On February 2, the court heard and denied Villalobos's *Marsden*[5] motion. On February 9, the court held an in camera hearing only with respect to records for Officer Wilkin relating to coerced statements and it ordered the disclosure of certain records.

---

[3] Subsequent references to dates are to dates in 2012 unless otherwise noted.

[4] *Pitchess v. Superior Court* (1974) 11 Cal.3d 531.

[5] *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

On March 1, the court heard and denied a *Marsden* motion by Villalobos.

On March 14, defense counsel filed a *Pitchess* motion seeking discovery of records pertaining to Officer Christopher Fern.

On March 15, defense counsel withdrew the *Pitchess* motion.

On March 22, the court granted Villalobos's *Marsden* motion.

On March 23, the court appointed new counsel for Villalobos.

On June 14, the prosecutor filed a first amended information charging Villalobos with second degree robbery, two serious felony enhancements, two prior prison term enhancements pursuant to section 667.5, subdivision (a) and one prior prison term enhancement pursuant to section 667.5, subdivision (b), and with having two prior convictions within the meaning of the three strikes law.

On June 19, the court heard and denied Villalobos's *Marsden* motion.

On June 21, the court heard and denied Villalobos's *Marsden* motion.

On June 22, a jury convicted Villalobos of second degree robbery. Additionally, in a separate proceeding on that date the court found true the two serious felony enhancements, the prior prison term enhancements alleged pursuant to section 667.5, subdivision (b), one of the prior prison term enhancements alleged pursuant to section 667, subdivision (a), and the allegations that Villalobos had two prior strike convictions.

On July 18, defense counsel filed a *Romero*[6] motion asking the court to strike Villalobos's strike convictions.

On August 9, the court denied Villalobos's *Marsden* motion.

On August 13, the court granted Villalobos's *Faretta*[7] motion.

On October 4, the court denied Villalobos's *Romero* motion and sentenced him to an aggregate indeterminate term of 35 years to life, a determinate term of 10 year for the

---

[6] *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497.

[7] *Faretta v. California* (1975) 422 U.S. 806.

two serious felony enhancements and an indeterminate term of 25 years to life on Villalobos's robbery conviction.

## VILLALOBOS'S CONTENTIONS

Villalobos's appellate attorney has filed a brief which summarizes the facts, with citations to the record, raises no issues, and asks this court to independently review the record. (*People v. Wende, supra,* 25 Cal.3d 436.) However, in a 41-page document filed on November 7, 2013, and a 128-page document containing attachments that was filed on January 29, 2014, Villalobos raises a myriad of contentions that are too numerous to address individually. We have considered his contentions and concluded that they have no merit. Nevertheless, we address below some of these contentions that we deem appropriate for discussion.

Many of Villalobos's contentions are similar and directly or indirectly raise issues that go to the sufficiency of the evidence to sustain his conviction for robbery. In reviewing sufficiency of evidence to support a conviction our role is limited; we determine whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Smith* (2005) 37 Cal.4th 733, 738–739 (*Smith*).) On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.) Reversal is unwarranted unless it appears that upon no hypothesis whatever is there sufficient substantial evidence to support the conviction. (*People v. Mason* (2006) 140 Cal.App.4th 1190, 1199.)

Substantial evidence must be of ponderable legal significance, reasonable in nature, credible and of solid value. (*People v. Johnson* (1980) 26 Cal.3d 557, 576–577.)

While we must ensure that the evidence is reasonable, credible and of solid value, it is the exclusive province of the judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends. (*Smith*, *supra*,

37 Cal.4th at p. 739.) In making our determination, we do not reweigh the evidence, resolve conflicts in the evidence, draw inferences contrary to the verdict, or reevaluate the credibility of the witnesses. (*People v. Little* (2004) 115 Cal.App.4th 766, 771.) Resolution of conflicting evidence and credibility issues was for the jury to decide. (*People v. Martinez* (2008) 158 Cal.App.4th 1324, 1331.)

Here, Sherman testified that the night of the robbery Villalobos showed up at her house and admitted to her that he had just kicked a door in and robbed someone down the street. Guevara testified that a few days after the robbery he identified Villalobos as the robber from a photo lineup and he repeated his identification in court during the trial. Additionally, during the trial in this matter, Duarte identified Villalobos as the man who appeared at his door prior to the robbery. Thus, the record contains substantial evidence that supports Villalobos's robbery conviction.

In the two documents he filed, Villalobos cites numerous examples of what he claims was perjured testimony by prosecution witnesses because the testimony conflicted with the witness's preliminary hearing testimony, with the trial or preliminary hearing testimony of other witnesses, other evidence introduced at trial, and/or with information in police reports or other information that was not introduced into evidence. He further contends that, by not correcting these inconsistencies, the prosecutor presented false testimony. For example, Villalobos claims witness Dominguez committed perjury when he testified that Villalobos was wearing a shirt because this testimony was contradicted by Villalobos's booking photo of that date and Officer Wilkin's testimony. Villalobos also contends that the prosecutor knew from police reports that Villalobos was not wearing a shirt when he was arrested in this matter. There is no merit to these contentions.

Inconsistencies between the testimony of witnesses at trial and other evidence do not necessarily mean that the witnesses were untruthful in their testimony. (See e.g., CALCRIM No. 105 ["Do not automatically reject testimony just because of

8.

inconsistencies or conflicts. Consider whether the differences are important or not. People sometimes honestly forget things or make mistakes about what they remember. Also, two people may witness the same event yet see or hear it differently"].) Further, it was defense counsel's responsibility to point out any evidence that undermined a prosecution witness's testimony and to argue the significance of any apparent inconsistencies. Thus, there is no merit to Villalobos's numerous claims that prosecution witnesses lied under oath or that the prosecutor presented false evidence.

Villalobos also contends that the prosecutor engaged in several instances of prosecutorial misconduct during the trial. For example, he claims that the prosecutor improperly vouched for the credibility of her witnesses during closing arguments when she argued that "it was evident" that the prosecution's civilian witnesses were truthful. However, "'a claim of prosecutorial misconduct is not preserved for appeal if a defendant fails to object and seek an admonition if an objection and jury admonition would have cured the injury." (*People v. Tully* (2012) 54 Cal.4th 952, 1009–1010.) The defense did not object to any of the instances of alleged prosecutorial misconduct cited by Villalobos or seek a curative admonition. Thus, none of Villalobos's claims of prosecutorial misconduct are cognizable on appeal.

Additionally, Villalobos cites *Duggan v. State Bar* (1976) 17 Cal.3d 416 (*Duggan*) to contend that contributing to the delinquency of a minor is a crime of moral turpitude. Thus, according to Villalobos, the prosecutor falsely argued in limine to the court that Sherman should not be impeached with two misdemeanor convictions for contributing to the delinquency of a minor because that offense does not involve moral turpitude. Villalobos is wrong.

*Duggan* involved a state bar proceeding against an attorney who had been convicted of contributing to the delinquency of a minor. (*Duggan*, *supra*, 17 Cal.3d at pp. 419-420.) In concluding that the manner in which the attorney committed this offense, which was not described in the record, involved moral turpitude, the court stated:

"'Conviction of some crimes establishes moral turpitude on its face. These include crimes that necessarily involve an intent to defraud or intentional dishonesty for the purpose of personal gain. [Citation] They may also include particular crimes that are extremely repugnant to accepted moral standards such as murder [citation] or serious sexual offenses [citations][.]' *We do not hold that the offense of contributing to the delinquency of a minor as proscribed by Penal Code section 272 is one involving moral turpitude per se. Rather, we conclude that under the facts of this case, the offense of which petitioner was convicted on his plea of guilty involved as a matter of law a crime of moral turpitude.* Without setting forth the unfortunate details, it is enough for us to say that the offense to which petitioner pleaded guilty evidences the commission of a reprehensible crime, offensive to every conception of morality." (*Duggan*, *supra*, 17 Cal.3d at pp. 422-423, italics added.)

Since contributing to the delinquency of a minor does not necessarily involve moral turpitude, Villalobos has not shown that the prosecutor falsely argued to the court that Sherman's two misdemeanor convictions for contributing to the delinquency of a minor did not involve moral turpitude.

Villalobos also makes certain arguments that are irrelevant to the issue of his guilt. For example, he complains that the prosecution introduced two pictures that show the security door and the wooden door at the entrance to the stairs that led to Duarte's and Guevara's upstairs apartments wide open. According to Villalobos, this misled the jury into believing that the suspect broke into the stairway area through these doors and left the doors wide open when he left. He further contends that this is not true because several people including Duarte and Guevara passed through the doors prior to the pictures being taken. However, it was clear from the trial testimony that several people had passed through the doors prior to the pictures of the doors being taken. Thus, there was no reason for the jury to conclude from the pictures that the robber broke into the stairway and left the doors wide open upon leaving simply because the two photos depict the doors in that position. Further, there was no dispute that Guevara was robbed in his apartment and the main issue in the case was whether Villalobos was the robber.

Whether the robber broke into the stairway through two doors and left them wide open or in some other position when he left was not probative of this issue.

Villalobos also contends that the prosecutor and defense counsel conspired to keep from the court that Officer Xiong was out of the country and unavailable to testify in order to prevent the officer from testifying and to prevent the court from declaring a mistrial due to his unavailability. Villalobos further contends that Officer De Leon's testimony regarding Duarte's statements that De Leon translated for Officer Xiong would have been hearsay. Thus, according to Villalobos, by proceeding to trial without Officer Xiong, the prosecutor and defense counsel prevented the jury from learning of evidence that would have impeached Duarte that could only have been introduced through Officer Xiong. Not so.

Preliminarily, we summarily reject Villalobos's contention that the prosecutor and defense counsel participated in any conspiracy because Villalobos has not cited any evidentiary support for this frivolous allegation. Nevertheless, we note that during the August 9, 2012, *Marsden* hearing, Villalobos admitted that *he agreed to proceed to trial without Officer Xiong*, although he claimed to have been misinformed by defense counsel that during the trial other officers would be able to read word for word Officer's Xiong's report. Further, since Officer De Leon translated for Officer Xiong when he interviewed victim Guevara, De Leon was a percipient witness to the statements Guevara made to Officer Xiong and could testify to the content of these statements absent an evidentiary rule that prevented him from doing so. Moreover, even though Guevara's statements to Officer Xiong were hearsay, Officer De Leon could testify to any of these statements that he translated that were inconsistent with Guevara's testimony because prior inconsistent statements are admissible as an exception to the hearsay rule. (Evid. Code, § 1235.) Thus, there is no merit to Villalobos's claim that only Officer Xiong could have provided evidence to impeach Guevara's statements to Officer Xiong or that the court would have declared a mistrial had it been aware that Officer Xiong was unavailable.

11.

As noted earlier, Villalobos raises other contentions that are too numerous to address individually and that we have considered and found to have no merit. Further, following an independent review of the record we find that no reasonably arguable factual or legal issues exist.

## **DISPOSITION**

The judgment is affirmed.